Good morning. May it please the court, Cal Potter on behalf of Augustus Simonette and his wife, Michelle. I wanted to focus on why the court erred in granting summary judgment on this matter, first from the perspective of whether there was a reasonable suspicion to make the stop. Mr. Simonette submits that what occurred here as an off-duty police officer from the Las Vegas Metropolitan Police Department at a shopping center in Las Vegas in what is known as the Summerlin area, long away from North Las Vegas. He was out there to pick up his son who was working at a tanning salon. He's there, drives by a North Las Vegas police cruiser who has stopped another vehicle, but he goes and parks. Your client, when he was asked, when the officers first approached him, as I understand it, was asked for his identification and instead he said, did I do something wrong, I'm just here to pick up my son, but he didn't give his identification. So then Officer Tonry repeats his request for identification, and once again your client fails to give his identification. He gives him a hard time, or one could infer. And under all the facts and circumstances, why wasn't that a highly suspicious behavior? Your Honor, based upon that rendition of facts from Officer Tonry, Officer Simonette, or Augustus Simonette, off-duty police officer, testifies that he gave him his name. In addition, he believed that they had the opportunity, because they came around from the back, to check the vehicle for the ownership. He also said that he was the RO. Simonette testifies that he is the RO, meaning that he is the registered owner of the vehicle. He gave a verbal identification, and I think what the Appleese even cite in their brief, is that Simonette refused saying that he did not have to give his identification, physically produce his identification, and that the officers were outside of their jurisdiction. That's what Simonette testified to. But in any event, what he also testified to, and what is acknowledged, is that not only was he the registered owner of the vehicle, but he was there to pick up his son. There were no efforts made to contact his son, who was working in the store. This was a strip mall. It was at 9 o'clock at night. It was a closing time. He was there to pick up his son. And the argument that was made based upon the totality, the circumstances of this particular matter, is that there were two other vehicles. Mr. Simonette is in a BMW, and his lights are on. There's another BMW with a white female, and then there's a Dodge pickup. The other two vehicles were never even approached or contacted. So Officer Simonette, believing that he was being selectively contacted, and wanted to know what he had done was wrong. And so he's in his car. He's texting or doing ringtones on his cell phone, and he's believing he hasn't done anything wrong. And he knows that he doesn't have to produce his identification. And what his statements are is he tells the officer who he is. But why do you say he doesn't have to produce his identification? Because under our reading and his understanding of Heibel, all he has to do is do an identification. All he has to do is state his name, and that's what he, in fact, did. And I believe that's the issue here in terms of what guidance this court could do or what needs to be addressed in terms of what Heibel actually says. I would suspect that there are many officers in Las Vegas, Nevada, or north Las Vegas, Nevada, or in our community, that believe that you have to produce the identification, that you actually have to give the license. And that is the question. But even if you don't have to, if he refuses to produce identification, doesn't that give reasonable suspicion to the officers to investigate further to determine if the identity he's verbally supplied is consistent with who he actually is? Well, Your Honor, the reading of Heibel is that you don't have to physically produce it. So the alternative, I think, what I tried to address before, was that in this particular instance you had an opportunity to contact, through dispatch, the identification or ownership of the vehicle to confirm whether he was giving the name and that it corresponded with the vehicle. But that doesn't identify the individual. That just tells you who owns the vehicle. It doesn't confirm that the person who is before you is, in fact, the individual he claims to be. That's correct, Your Honor. But that is what Heibel talks about, is what is the obligation. And the obligation is not to produce the identification. He finally identified himself. But as a corollary to that, the police officer can also have reasonable suspicion that because the person is disinclined to confirm his identity, that something, some criminal activity is afoot. So that cuts both ways. Well, but, Your Honor, under Terry, the same arguments are made. If a Terry stop is made, an individual does not have to give identification, merely has to identify themselves. And I think what happened here was Officer Simonet, knowing what Heibel and what his training as a Las Vegas Metropolitan Police Officer was, he knew that he didn't have to produce identification. It was only at the time when Officer Connery, it wasn't that he had other suspicions. What he said is, I've had enough of this crap. Either get out of the car or I'm going to tase you. So under the threat of being tased, he's pulled out of the, comes out of the car, and at that point in time identifies himself as a police officer, a Las Vegas police officer. But that isn't even enough at that point in time. He also tells him that his identification, so you have a corrosive seeking of identification in the vehicle at that point in time. But that still isn't enough. They handcuff him at that point in time and then go and do what should have been done initially. They contact dispatch. They make a confirmation that he is a police officer. But oddly enough, North Las Vegas dispatch tells them that he was a correctional officer. So he remains handcuffed because they make a distinction of whether, in fact, you're a patrol officer or whether you're a correctional officer. So he remains handcuffed. He wants to make sure that his son doesn't see him in this embarrassing situation. He asks to be handcuffed, but it doesn't occur. So over this period of time, he's not only been threatened with deadly force from a taser, potentially deadly force, but he's also handcuffed and remained handcuffed, and the arguments being that they're doing this to check out his identification. Well, they already know his identification at that point in time. They have his metro identification because rather than be tased, he turned over all of these under those types of situations. So I would submit to you that what needs to be fleshed out here, and even looking at these cases and coming to argue as to what highball actually means, and I submit to you that Officer Simonett's reading of it, as well as what we have submitted in our briefs, is correct, that you don't have to have a production of the physical identification. The district court provided ñ summary judgment based on qualified immunity, so it's not a question of how the law might be interpreted. It's a question of how a reasonable officer might have, on the state of the law at the time, viewed the law. That's correct, Your Honor, and I think a reasonable officer has to be up to date on what the actual holdings of the law is, and there is a, like I said, there's a divergence, I believe, in the perception of what highball actually says. In our community, I think there are a lot of police officers, not only in North Las Vegas, but in the Metropolitan Police Department, that believe that you have to produce ID during a Terry Stop or during a vehicle-type situation. The reliance of the district court was on Ramirez versus Buena Park, and clearly that case is distinctual because it was a DUI-type case where an individual is either asleep or passed out in their vehicle and not responding. Those officers were on routine patrol. What we had here is North Las Vegas Police Department patrol officers way out of the jurisdiction of the city of North Las Vegas. They're out in Las Vegas, and I would submit that the red herring that was argued, well, peace officers in Nevada can, of course, arrest or contact anywhere in the state, but you don't see normally patrol cars from North Las Vegas over in Las Vegas, and not only over in Las Vegas, but many, many miles from North Las Vegas. But you said this was in Summerlin. It says that it was Farm Road and Durango. That's not that far from the boundaries of North Las Vegas. Well, it was actually quite a ways, but I think it was about four miles. But granted, Judge, I know you're familiar with the area. But the situation was much different than the Ramirez case where an individual was actually either passed out. And that, based on that fact scenario, triggers all of the implied consent issues of a DUI and what can be done. Those weren't the facts that were involved in this particular case. And I know that I'd like to reserve some time. I would also submit that under the state tort claim, there has been a change in Nevada concerning the adoption of the federal tort claim standard. It used to be if it was any type of discretion, then there was immunity. In this particular instance, the court has adopted the federal tort claim standard of Gobert-Berkowitz. And we submitted that in the Butler v. Baird and the Martinez v. Muzuzak case out of Nevada, dealing with that state tort claim, that it's a two-prong analysis now that although most instances there is some type of discretion, the decision has to be made based upon a social, economic, and political policy analysis. And that did not occur in this particular instance. We cite the case of Garcia, which is a Ninth Circuit case, a federal tort claim talking about excessive force cases. And the decisions are always made in those types of arrests, but unless they're made based upon, once again, an economic or policy-type argument, then the operational decision is just the first part. And we would submit that based upon that analysis, that there was, once again, a violation of the state torts as well. I would like to reserve my remaining time. All right, counsel. Good morning, Your Honors. Robert Freeman here on behalf of the City of North Las Vegas and the individual defendant officers. Obviously, we believe that the judge correctly decided the motion for summary judgment. The order is in the record. It speaks for itself. The judge pro-believed that the officers had reasonable suspicion to approach Mr. Simonet. So why did they handcuff him after he has identified himself? They've checked out, and they find he is, quote, a corrections officer. I'm unclear why that should be distinguished from a police officer for these purposes. He has done everything to satisfy them, both that he's legit and that his reason for being there is legit, and yet they handcuff him. Well, he was handcuffed before they knew he was a peace officer. So even if he weren't a peace officer and if he identified himself, why wouldn't that be sufficient under Hillel to allay their concerns? Well, because their concerns weren't that this is to their concerns were specifically related him to what they considered a high-risk stop. They thought that he was driving a layoff vehicle that was related to the drug arrest that they were making. Through their experience, they know that the layoff vehicle poses a threat to the officers. The testimony, the undisputed testimony in the case is that layoff vehicle is there to either, in a minimum, harass the officers, try to distract them so that the drugs or money or weapons that are in the car that's being stopped can be retrieved at a maximum. It's there to actually do physical harm to the officers. So they went to identify him because they were suspicious he was part of the drug arrest that was going down. It wasn't like in Ramirez. In the Ramirez case, there was a pat-down search after they put Mr. Ramirez in handcuffs, and the court found that that was excessive because Mr. Ramirez didn't pose a threat to him. To allow them to handcuff anybody that they suspected being under the influence was tantamount, according to this Court, to saying that anybody who takes drugs is a danger to the officers. In this case, it's different than that. He was a danger to the officers based on the suspicions that they had that caused them to approach him in the first place. And what were the suspicions based on? The suspicions were based upon, as Judge Prolate them out, these officers are patrol officers. They're making a high-risk drug stop at the request of undercover drug enforcement officers. The drug enforcement officers know that there is heroin in the car because they tried to make a buy from these guys earlier in the evening. And what Officer Stuckey testified to was the drug sellers showed them part of the heroin they were going to sell them. They wanted to see the money. The officers showed them the money. They said they're going to go back to their house to get the rest of the drugs. At some point, as they're going back to get the rest of the drugs, those guys made the undercover officers. I think the testimony from Officer Middlebrook was, we don't have that many. In Northwest states, we don't have that many undercover cars, so our cars become recognizable to these guys. So now that they've been made, they're not going back to the drug house, but there's drugs in that car. So Officer Middlebrook calls in the patrol officers to make a traffic stop so that they can get the drugs and make an arrest of these people. They're in a parking lot of closed shopping centers. They're in the parking lot for two minutes when Mr. Semenek comes into the parking lot. He circles around the stop. They notice him. He parks momentarily in front of closed stores along a red fire lane. Then he moves out into the parking lot away from everyone else, sits in his car, leaves the engine running, leaves the lights on, and at least part of the time is watching their stop. So he became suspicious to these officers. The officers also know that there are potentially other undercover vehicles. They know there are undercover drug officers in the area, so they check. They want to make sure that he's not driving one of the undercover vehicles. Both officers call members of the undercover team to ask them, hey, is this one of your guys? They say no, he's not. You should treat it as an officer safety issue. The presence of the layoff vehicle is an officer safety issue, so that's what they did. They approached him, and as you point out, Judge, he refuses, even through his own admissions, refuses to give any information several times. I think he described it as a back and forth that went on for a while. Who are you? What did I do wrong? Who are you? What did I do wrong? I think Officer Connery testified that Simonette would just talk over him. He was trying to explain to him. He was Mr. Simonette was questioning their jurisdiction, their police power to even be there. Was there any significance to the fact that they were outside the technical boundaries of their jurisdiction? No. In Nevada, peace officers can make arrests and stops anywhere within the state. In point of fact, the evidence suggests that this traffic chase started in North Las Vegas. It just ended up outside of North Las Vegas. It was an operation run by North Las Vegas undercover drug officers. As Judge Proe pointed out in his decision, as the kind of uncooperativeness, Mr. Simonette says, testified that he was polite, but he was obviously uncooperative. The uncooperativeness actually raised the suspicion of officers that are asking the questions. And I think they all testified that if he had just said who he was in a way that was professional, it would have taken 30 seconds to eliminate him as the layoff vehicle, and they could have gone back to their job. He refused to do that. He's the reason that any force had to be used at all. And he testified, I mean, he may now say that the reason he didn't give them the paper evidence or his physical ID was because of high bull. What he testified to in his deposition is that he considered the stop consensual. Judge Proe pointed out that it doesn't matter what's in his head. It matters what the officers who are asking him, what's in their head. The officers that are asking him for his identification do not consider the stop consensual, and they don't want to give him the reason why they're asking him for his ID, because giving him the reason will alert the Confederates that this is a drug bust and not a traffic stop. And you can see that in the internal affairs investigation interview we gave. I think Officer Simonette ended up agreeing at some point that he understood what the officers were doing and why they did it. He believed that he had the absolute legal right to know why they were asking him for his identification. And, you know, the Fourth Amendment just requires reasonable suspicion. The case law is massive that questions about the person's identity is part of that process. In Hybel, I don't know that there's a confusion about whether you have to give oral information or paper information as a result of Hybel. All Hybel said was in Hybel that person had been arrested for violating the Nevada statute. So one of the things that the United States Supreme Court was doing was trying to determine whether that Nevada stop and identify statute was constitutional. And in so doing ---- But it does say that the only requirement is to give the name. It doesn't require a paper identification. And that's how the Nevada Supreme Court had interpreted the Nevada statute, is to only require to give the name. The Fourth Amendment is not the same. The Fourth Amendment allows the reasonable stop and it allows you to ask for identification. And if you don't want to give it, it allows you to do further investigation until you find out what that identification is, provided there was reasonable suspicion to make the stop in the first place. And that's what the courts are worried about when they see these stop and identify statutes. And that's why they were careful to talk about the limited scope of the Nevada statute, because they wanted to differentiate it from, you know, they gave a long litany of other state statutes, some of which had been held unconstitutionally vague, because it gave the officers too much opportunity to kind of bootstrap an arrest under the specific state statute when they couldn't get enough evidence to make an arrest pursuant to the Terry stop. And the court, quite rightly, is concerned to make sure that that doesn't happen, so they were noting that the Nevada statute had been narrowly drafted and narrowly interpreted so that it was constitutional. The facts are in Hybel, the police officer asked for the paper ID of that guy 11 times, and he didn't give it. The facts are in Hybel, the United States Supreme Court found that that Terry stop and that request for the actual identification was constitutional under the Fourth Amendment. So I don't think that there's necessarily confusion, but to the extent there is any confusion, then the officers are obviously entitled to qualified immunity, I would think, because a reasonable officer would have thought that they can ask for the paper ID. Now, if Officer Simonetti, we don't know what would have happened had he not volunteered that his ID was in the car and the officers could get it, but maybe some of these other alternatives would have been necessary. Of course, the stop would have been prolonged if they had to do other things to determine his identification. But determining his identification was precisely related to the reason that they approached him in the first place, and that's what was important to Judge Proe, and I think that's what's important under the case law. The use of force, by the time they had to put him in handcuffs, their suspicions were so heightened that I think Officer Stuckey even believed that even after Simonetti had been identified as a corrections officer, that he might still somehow be involved because he just couldn't believe that a fellow peace officer would be this uncooperative, this belligerent in response to what was an ongoing police process. I think that the Court granted summary judgment as to the State law claims on the merits of the claims. Just on that last point, though, that wasn't undisputed, right? I mean, the plaintiff claims he was not belligerent. That's what I'm saying. He claims he was not belligerent, but he does admit that he refused to give information for quite some time. I think he described it as a couple of minutes. It's hard to tell how many times they asked him and he refused before he even gave him his last name. He gave him his last name, and again, he did that and says today that that would have given them sufficient information because they had already run his plates. Both the officers testified that they didn't run his plates. They did look at his plates, and they do call in plates pursuant to policy and practice. And as Officer Stuckey testified, they do that in case something bad happens, then dispatch knows where to go first. They have an identification of a car, so they'll say they're out with and they'll give a license plate number so that the dispatch would have and the police department would have something to go on if something bad happened. But they had not run his plates, and as Your Honor pointed out, running his plates would have only revealed the registered owner. It would have given them no real ID of who this person is with respect to and how he's related to the registered owner. I was getting to those State tort claims because I think quite apart from granting them State statutory immunity, I think the Court went through them and quite precisely granted summary judgment on the merits of those claims. No breach of a duty for negligence. No unlawful touching for battery. No outrageous conduct for intentional infliction of emotional distress. No evidence of negligent hiring or training. So you don't need to, in my view, don't need to be bothered with wondering whether the State immunity statute as it's currently interpreted applied in this case because I think Judge Proe resolved those claims on the merits. If you don't have any more questions, I'll quit early. Thank you, counsel. Rebuttal. Your Honor, I think what was just said underscores what actually occurred here. There is a perception that if you're a police officer, then you have to cooperate with other people. Officer Simonett's perception was that he was trained as a police officer. He was there not doing anything incorrect. He was there to pick up his son. And that when he was contacted by the police of North Las Vegas in front of his son's store, that his obligation, if indeed we don't agree with what his belief was that there were other cars there, there were another BMW, there was a white woman, those people were never contacted. If it is indeed a consensual type situation and it's not based upon his race, which he believed that it was, then what occurs here is his statement that he does identify himself, but that still isn't enough. And I would submit to you when they argue that it's officer safety that it wasn't an officer safety situation because what occurred was they left two rookie officers over with the people they knew were the drug dealers, and they made no efforts to try and do what was logical, to contact his son if, in fact, they were concerned about what he was there for and what he was doing. He identified himself. Plus, they could have ran to show that he was the owner of the vehicle, and there wasn't a danger. But more importantly, after he identified himself, even after he identifies himself as a police officer, which is what everyone there at the scene seemed to believe should have occurred, they still didn't unhandcuff him. They went off on this, well, you're a correctional officer, so somehow you might still be involved in this. And it doesn't stop there, Judge. What happens is internal affairs for both departments are then called. He's taken back in the back of the Albertsons, and the sergeant there in charge of the judge. After he says to them, I'm a police officer, they then check it out. They find out that he's a correctional officer. There's a little back and forth between them as to whether that he misrepresented himself as a police officer, and he says no, and so forth. But then they remove the handcuffs, don't they? They finally remove it after a point in time, but not initially. Well, what's the time between the time that they found out he was a correctional officer and the time they removed the handcuffs? It's in a probably less than a five-minute interval, but they don't do it at that point in time. They go back and forth. And then he's taken back behind this door, or told by the sergeant to go back there. But he's not handcuffed at that point in time. But he's told to go back there and meet with them so that they can discuss what has been going on here. And I would submit to you that based upon that, that there isn't a fact-driven issue here as to what occurred in terms of the qualified immunity issue. That, in fact, Officer Simonet, as a trained police officer, knew what his rights were, and he tried to make sure that his rights weren't violated. And, on the contrary, what this officer did in threatening to tase him, to force him out, is coercive in nature. And that isn't a good faith belief. Officers on a daily basis deal with people who are not polite. I mean, they're taught to de-escalate situations. That's not what happened here. What occurred is the officer got out of his car, or the off-duty officer, Simonet, got out of his car because he was threatened that he was going to be tased if he didn't cooperate. And the statement was, I've had enough of this crap. Now, that's the statement that has been testified to. And then he gets out of the vehicle. Well, having nothing to do with the legal issue before us, but it's hard for me, at least, not to draw the inference that these were three very arrogant people, none of whom knew that being a police officer is a major public servant, not someone who can throw their weight around. Yes, sir. Thank you. All right. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court.
judges: Tashima, Rawlinson, Cjj Rakoff (S. New York), Dj